**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **HAMEEDULLAH AMINI AIRAJ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 15-983 (ESH)** |
| | ) | |
| **UNITED STATES DEPARTMENT OF STATE**, | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff, an Afghan national, has sued the United States Department of State, seeking documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, relating to the State Department's decision not to grant COM ("Chief of Mission") approval for plaintiff to apply for a Special Immigrant Visa.  Before the Court is defendant's Motion for Summary Judgment (Jan. 8, 2016 [ECF No. 17] ("Def's Mot.")) and plaintiff's Motion for Partial Summary Judgment (Jan. 22, 2016 [ECF No. 21] (Pl's Mot.")).

As explained herein, the Court grants defendant's motion for summary judgment and denies plaintiff's motion for partial summary judgment.

**BACKGROUND**

**I.     THE AFGHAN SPECIAL IMMIGRANT VISA PROGRAM**

In 2009, Congress passed the Afghan Allies Protection Act (AAPA).  Pub. L. 111-8, Div. F, Title VI, Mar. 11, 2009, 123 Stat. 807.  The statute was designed, in part, to provide an immigration route to the United States for Afghans who had risked their own safety in order to cooperate with American military forces in their fight against the Taliban.  The AAPA created the Special Immigrant Visa (SIV) program, which specified four criteria for eligibility to apply

for an SIV: (1) status as a citizen or national of Afghanistan; (2) past or present employment by or on behalf of the U.S. government beginning on or after October 7, 2001; (3) faithful and valuable service to the U.S. government, documented in a positive recommendation or evaluation from a supervisor; and (4) an ongoing serious threat as a consequence of employment by the U.S. government.  *See id.* § 602(a)(2)(D).  In order to fulfill the third criterion, the AAPA requires that the recommendation or evaluation from a supervisor be "accompanied by approval from the appropriate Chief of Mission…who shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section."  *Id.*  This requirement in the SIV application process is commonly referred to as Chief of Mission or "COM" approval.

A State Department website entitled "Special Immigrant Visas for Afghans" lays out a series of steps for Afghans interested in the SIV process.  It first directs petitioners to "STEP 1— Apply for Chief of Mission Approval," a link which opens a document providing Applicant Guidelines for COM Approval.[1]  Petitioners submit their information and required documentation by email to the State Department, which forwards completed COM applications to the U.S. Embassy in Kabul for a decision by the appropriate COM designee.  Applicants who receive COM approval then proceed to the application's second step, which involves filing a Form I-360 Petition with United States Citizenship and Immigration Services (USCIS).  If the USCIS Petition is approved, the applicant moves on to the third step and prepares a final visa application.  The fourth and final step involves a visa interview.

---

[1] *See* U.S. Dep't of State, Special Immigrant Visas for Afghans, at
https://travel.state.gov/content/visas/en/immigrate/afghans-work-for-us.html ("State Dep't SIV App. Website").

II.     **PLAINTIFF'S APPLICATION FOR COM APPROVAL**

Between June 2008 and January 2012, plaintiff worked as a linguist with Mission Essential Personnel (MEP) in support of the United States Armed Forces at Camp Phoenix in Afghanistan.  (Declaration of Carl G. Roberts ("Roberts Decl."), Ex. 1, Jan. 22, 2016 [ECF No. 21-4].)  In 2012, plaintiff was terminated for refusing to participate in a mission within the Khost Province of Afghanistan.  According to plaintiff, members of the Taliban had threatened his life on multiple occasions, and the Khost mission posed what he deemed to be an unacceptably high risk to his safety.  (*Id.*)  Multiple members of the U.S. military who have written laudatory letters of recommendation in support of plaintiff's immigration applications confirm that plaintiff faced ongoing, legitimate threats from the local population for his cooperation with the U.S. armed forces.  (*Id.*)  Plaintiff claims that MEP would not allow him to take a different, less dangerous assignment, so he was "suspended from [his] work with" the U.S. government.  (*Id.*)

Plaintiff applied for COM approval to submit a petition for the SIV program three separate times, including twice in 2011 and a third time in 2013, and was denied each time.  (*See id.* ¶ 4.)[2]  The response letters from the State Department's Kabul Embassy are each entitled "Chief of Mission Denial for Afghanistan Special Immigrant Visa Status" and all cite the same reason for denying plaintiff COM approval: "Derogatory information has been associated with you which is incompatible with the regulations of the Special Immigrant Visa Program."  (*Id.* at Exs. 2-4.)

---

[2] Plaintiff claims to have filed a fourth application for COM approval on August 20, 2014, *after* he made his FOIA request.  (*See* Roberts Decl. ¶ 3.)  It is unclear from the record whether plaintiff's latest COM application has been adjudicated or is currently pending.

### III.     PLAINTIFF'S FOIA REQUEST

In a letter dated January 16, 2014, plaintiff submitted a FOIA request to the Office of

Information Programs and Services (IPS) for:

> all documents and information from December 1, 2010 through January 16, 2014
> pertaining to the special immigrant visa or "SIV" application of Hameedullah Airaj,
> birthdate January 1, 1988, for USRAP- resettlement as contained in the records of the
> Refugee Processing Center, including any and all information from his full Worldwide
> Refugee Admissions Processing System file.

(Declaration of John F. Hackett ("Hackett Decl."), Ex. 1, Jan. 8, 2016 [ECF No. 17-3].)  Plaintiff

also requested a fee waiver.  In a letter dated February 20, 2014, IPS acknowledged receipt of

plaintiff's request, assigned it a case control number, and denied plaintiff's request for a fee

waiver.  It also advised that "unusual circumstances (including the number and location of

Department components involved in responding to your request, the volume of requested

records, etc.) may arise that would require additional time to process your request," but it would

notify plaintiff as soon as responsive material was retrieved and reviewed.  (*Id.* at Ex. 2.)

Plaintiff appealed the denial of a fee waiver by letter dated March 21, 2014, and on March 31,

IPS advised plaintiff that it had upheld its denial of a fee waiver.  On April 27, 2014, plaintiff

requested expedited processing of his FOIA request, and on May 2, 2014, IPS informed plaintiff

that it had granted his request for expedited processing.

IPS initially determined that the offices most likely to have documents responsive to

plaintiff's request were the Bureau of Population, Refugees and Migration (PRM) and the Office

of Visa Services within the Bureau of Consular Affairs.  Defendant's search of databases used by

PRM yielded no responsive documents, but it recovered fifty-four documents from its search of

multiple databases used by the Office of Visa Services.

On November 24, 2014, IPS notified plaintiff that it had located fifty-four responsive documents.  The letter stated that, although the documents pertained to the application for a visa or permit to enter the United States and thus could be withheld pursuant to 5 U.S.C. § 552(b)(3) (" FOIA Exemption 3") and Section 222(f) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1202(f), defendant had decided to produce the documents because they had originated with or previously been seen by plaintiff.  Due to a clerical error, defendant failed to include all fifty-four documents in its initial production, although it would later cure the mistake by producing the remaining documents retrieved from the Office of Visa Affairs.[3]

On January 9, 2015, plaintiff appealed defendant's response to his FOIA request. Plaintiff's letter acknowledged that it was unclear whether defendant was relying on Exemption 3 to withhold records, but nonetheless challenged its application to the responsive documents. (Roberts Decl., Ex. 6, at 3 (arguing that "the Department has erred in its application" of Exemption 3).)  Plaintiff also added specificity to his initial FOIA request:

> Mr. Airaj requests that the Appeals Review Panel direct the Department to immediately release to us all documents pertaining to Mr. Airaj's petition for COM approval to file an SIV application, including specifically any documents containing or describing the reasons for denial of COM approval and any other documents relating to that decision or the process through which it was made.

(Roberts Decl., Ex. 6, at 1-2.)  Defendant acknowledged receipt of plaintiff's appeal on January 13, 2015, but apparently did not reach a decision before plaintiff filed his complaint with this Court on June 23, 2015.  On July 17, 2015, defendant advised plaintiff that his administrative appeal had been superseded by ongoing litigation and that it had closed the appeal.

---

[3] On November 20, 2015, defendant notified plaintiff of its error and produced all fifty-four documents retrieved from the Office of Visa Affairs.

In September 2015, IPS re-evaluated plaintiff's FOIA request in light of the reference to his petition for COM approval in his appeal letter and determined that the U.S. Embassy in Kabul, Afghanistan was reasonably likely to maintain responsive documents. Defendant's search of the Embassy located four responsive documents that contained information about plaintiff's COM application. On October 8, 2015, the State Department produced the responsive portions of the four documents retrieved from the Kabul Embassy, withholding three documents in part and one in full.

## IV.     THE FOUR EMBASSY DOCUMENTS

Defendant's *Vaughn* Index (Hackett Decl. at Ex. 13) describes the four documents retrieved from the Embassy and the FOIA exemptions upon which it relies:

Document A is a 128-page document entitled "SQ-SIV COM Committee Meeting Minutes August 31, 2013." It lists decisions made by the COM Committee as to 158 prospective SIV applicants, including plaintiff. Most of the document is non-responsive, as it pertains to COM decisions as to third parties. Defendant withheld it in part under FOIA Exemption 3, 5 U.S.C. § 552(b)(3), pursuant to § 222(f) of the INA. It also withheld the name of a diplomatic security official under FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6), and (b)(7)(C).

Document B is a one-page report of eligibility criteria relating to plaintiff's application for COM approval. Defendant withheld it in full under FOIA Exemption 3.

Document C is a seven-page document entitled "Mission Afghanistan SQ-SIV Program" and dated March 14, 2012. It relates to the adjudication of COM applications for forty-eight prospective SIV applicants, including plaintiff, and recommends decisions as to COM approval or non-approval. Defendant withheld it in part under FOIA Exemption 3, pursuant to § 222(f) of

the INA, and Exemption 5, pursuant to the deliberative process privilege.  It also withheld the name of a diplomatic security official under FOIA Exemptions 6 and 7(C).

Document D is a 154-page document entitled "SQ-SIV Committee Agenda June 15, 2013," much of which is non-responsive.  It also relates to the adjudication of COM applications for 213 prospective SIV applicants, including plaintiff, and recommends decisions as to COM approval or non-approval.  Again, defendant withheld it in part under Exemption 3, pursuant to § 222(f) of the INA, and Exemption 5, pursuant to the deliberative process privilege.  It also withheld the name of a diplomatic security official under FOIA Exemptions 6 and 7(C).

## V.    PROCEDURAL HISTORY

On December 16, 2015, the Court ordered defendant to file the four unredacted Embassy documents for *ex parte, in camera* review.  Defendant filed its Motion for Summary Judgment on January 8, 2016, and submitted the four unredacted documents for the Court's review on January 11, 2016.  Plaintiff filed its Opposition and Cross-Motion for Partial Summary Judgment on January 22, 2016.  Defendant filed its Reply and Opposition to plaintiff's Cross-Motion on February 5, 2016, (Def's Reply, Feb. 5, 2016 [ECF No. 23]), and plaintiff filed its Reply on February 19, 2016.  (Pl's Reply, Feb. 19, 2016 [ECF No. 26].)

## ANALYSIS

## I.    LEGAL STANDARD

FOIA imposes a duty on federal agencies to make all records promptly available to any person "upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed[.]"  5 U.S.C. § 552(a)(3).  FOIA is based on the premise that an informed citizenry is "vital to the functioning of a democratic society [and] needed to check against corruption and

to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, (1978); *see also U.S. Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976) (purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny") (internal quotations and citation omitted).  The statute nevertheless contains nine delineated exemptions that prohibit the disclosure of certain information to the public.  *See* 5 U.S.C. § 552(b).

Summary judgment is appropriate if the pleadings, the materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Bloomgarden v. U.S. Dep't of Justice,* 2016 WL 471251, at *2 (D.D.C. Feb. 5, 2016).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits its own affidavits or declarations or documentary evidence to the contrary.  *Neal v. Kelly,* 963 F.2d 453, 456 (D.C. Cir. 1992).

FOIA cases frequently are decided on motions for summary judgment.  *Defenders of Wildlife v. U.S. Border Patrol,* 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  A district court reviews *de novo* an agency decision regarding a FOIA request. 5 U.S.C. § 552(a)(4)(B).  In a FOIA case, a court may award summary judgment based solely on information provided in affidavits or declarations so long as the affidavits or declarations are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotations marks omitted), and "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within

the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981).  An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [FOIA's] inspection requirements." *Beltranena v. U.S. Dep't of State,* 821 F. Supp. 2d 167, 175 (D.D.C. 2011) (quoting *Goland v. CIA,* 607 F.2d 339, 352 (D.C. Cir.1978)).

## II.   DEFENDANT'S DUTIES UNDER FOIA

Plaintiff raises three arguments as to why defendant failed to discharge its obligations under FOIA.  He argues that (i) defendant's response was egregiously untimely, (ii) its searches were inadequate, and (iii) the claimed exemptions do not apply.  After reviewing the declarations, the unredacted documents from the U.S. Embassy in Kabul, and the record in its entirety, the Court is satisfied that defendant has responded to plaintiff's request in a sufficiently timely manner, conducted a reasonable search, and properly withheld the four Embassy documents in part from disclosure.

### A.  Timeliness of Response

When an agency receives a proper FOIA request, it has twenty working days to make a determination as to the request.  5 U.S.C. § 552(a)(6)(A)(i)(2006), amended by OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524.  Under "unusual circumstances," however, an agency can extend the twenty-day time limit for processing the request.  5 U.S.C. § 552(a)(6)(B)(i).  The statute defines multiple types of "unusual circumstances," such as the need to search for and collect records from separate offices, the need to search for and collect voluminous amounts of records, and the need to consult with another agency or agency component about the request.  *Id.* § 552(a)(6)(B)(iii); *see also Sierra Club v. U.S. Dep't of*

*Justice*, 384 F. Supp. 2d 1, 31 (D.D.C. 2004) (finding that an onerous request constituted "unusual circumstances" relieving the agency of normal timeliness constraints). Courts have also recognized that agencies sometimes cannot meet the timeframe due to the volume of requests, resource limitations, or other reasons, and that basic fairness and "first in-first out processing" are often more realistic benchmarks for measuring the timeliness of an agency's response. *See, e.g.*, *Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 615 (D.C. Cir. 1976) (recognizing and excusing agencies' failure to comply with statutory limits due to a deluge of requests and inadequate resources with which to respond to the requests); *Al-Fayed v. CIA*, No. 00-2092, slip op. at *9 n.5 (D.D.C. Jan. 16, 2001) (noting that "even if the [agency] did not adhere" strictly to the statutory time limits, there is little support that such a system is required so long as the agency's processing system is fair overall); *Summers v. CIA*, No. 98-1682, slip op. at *4 (D.D.C. July 26, 1999) (recognizing that agency need not adhere strictly to time requirements so long as "it is proceeding in a manner designed to be fair and expeditious").

In this case, defendant appears to have acted in good faith in responding to plaintiff's initial FOIA request in a reasonably expeditious manner. Plaintiff's initial letter was dated January 16, 2014, and defendant responded to it on February 20, 2014,[4] advising plaintiff that unusual circumstances may arise that could require additional time to process the request. And indeed, IPS ultimately widened the scope of its search for records to include multiple offices in multiple countries--a condition falling squarely within FOIA's statutory definition of "unusual circumstances."

---

[4] The statutory time frame is triggered upon defendant's receipt of the request, not the date it was mailed.

Still, plaintiff asks the Court to find defendant's behavior to be so "egregious" that it must rule in plaintiff's favor.  (Pl's Mot. at 5.)  While timely access to governmental records is an essential part of FOIA's statutory purpose, the Court is unaware of any legal authority that has enforced FOIA's time requirements by granting summary judgment to a plaintiff under circumstances similar to this case.  Plaintiff relies on a single case from this jurisdiction to support its argument, *Judicial Watch, Inc. v. U.S. Dep't of Homeland Security*, 2009 WL 1743757 (D.D.C. 2009).  Yet, *Judicial Watch* is readily distinguishable from the instant case.  In awarding attorney's fees to the plaintiff for his successful FOIA action, that court relied principally on the fact that the government had *never even communicated* with the plaintiff to acknowledge receipt of his request prior to the lawsuit.  *See id.* at *6.  In contrast, defendant here not only acknowledged the request fairly promptly, but also immediately raised the possibility of "unusual circumstances" delaying the production of responsive documents.  Moreover, defendant actually *did* produce responsive documents well before plaintiff filed his lawsuit.  In short, the Court finds that IPS was reasonably fair and expeditious in responding to plaintiff's FOIA request, and that there is no legal or factual basis for entering judgment in plaintiff's favor.

### B.  Adequacy of Search

Plaintiff also challenges the adequacy of defendant's search for records responsive to his FOIA request.[5]  An agency can prevail on a motion for summary judgment if it shows "beyond

---

[5] As a threshold matter, the Court is unpersuaded by defendant's argument that plaintiff has failed to administratively exhaust such a challenge.  According to defendant, judicial review of the search's adequacy is barred by the fact that plaintiff did not explicitly attack the adequacy of the search in its administrative appeal letter dated January 9, 2015.  To begin with, the Court finds such an attack to be implicit in plaintiff's letter.  Second, plaintiff's administrative remedy was constructively exhausted by defendant's failure to timely adjudicate plaintiff's appeal.  FOIA requires an agency to make a determination on an administrative appeal within twenty working days of its receipt.  5 U.S.C. § 552(a)(6)(A)(ii).  Although defendant acknowledged receipt of plaintiff's appeal, it never reached any decision during the approximately six months

material doubt [] that it has conducted a search reasonably calculated to uncover all relevant documents." *Edmonds v. FBI*, 272 F. Supp. 2d 35, 57 (D.D.C. 2003) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).   For purposes of this showing, the agency "may rely upon affidavits ..., as long as they are relatively detailed and nonconclusory and…submitted in good faith."  *Weisberg*, 705 F.2d at 1351.  The required level of detail "set[s] forth the search terms and the type of search performed, and aver[s] that all files likely to contain responsive materials (if such records exist) were searched."  *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990).  The fundamental issue is not "whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg,* 745 F.2d at 1485 (D.C. Cir. 1984).

In the Hackett Declaration, defendant properly relies upon a reasonably detailed affidavit, which sets forth the State Department's search for responsive documents in three different offices and multiple government databases.  (Hackett Decl. ¶¶ 15-28.)  As the affidavit notes, defendant actually widened the scope of its initial search beyond the terms of plaintiff's FOIA request, which was limited to "records of the Refugee Processing Center, including any and all information from his full Worldwide Refugee Admissions Processing System file."  (Hackett Decl. at Ex. 1)  In response, "an analyst with knowledge of both the FOIA request as well as the organization of records systems [employed by the Bureau of Population, Refugees, and Migration ("PRM")] searched the Worldwide Refugee Admissions Processing System ("WRAPS") database" using the plaintiff's name and the date parameters specified in the FOIA

---

prior to plaintiff filing his complaint in this Court.  Its failure to do so constructively exhausted plaintiff's administrative remedies.  *See, e.g.*, *Wildlands CPR v. U.S. Forest Serv.*, 558 F. Supp. 2d 1096, 1102-03 (D. Mont. 2008) (finding constructive exhaustion where agency did not timely adjudicate an administrative appeal).

request.  (Hackett Decl. ¶ 20.)  In addition, the State Department searched a number of additional databases and locations outside of the WRAPS database for any information relating to SIV applications with plaintiff's name, including the Office of Visa Services' Consular Consolidated Database ("CCD"), the Consular Lookout and Support System, the Non-Immigrant Visa system, the Immigrant Visa Overseas system, and the National Visa Center.  (*Id.* ¶ 23.)  After plaintiff included a more specific request in his appeal letter which referred to his COM application, an SIV case worker knowledgeable about the Embassy's records systems searched the Embassy's network drive for SQ-SIV documents involving Mr. Airaj's name and associated case numbers, and also searched the office itself for paper files.  (*Id.* ¶¶ 27-28.)

The Court finds that the Hackett Declaration's description of the offices searched, the breadth of databases and electronic record systems searched, and the terms used by officials familiar with the document storage systems amply demonstrate that defendant conducted a search reasonably calculated to uncover all responsive and relevant documents.

Plaintiff objects to the adequacy of the search by arguing that the fact that defendant's initial search in 2014 did not include the Kabul Embassy demonstrates a deficiently narrow scope to its FOIA response.  (Pl's Mot. at 8.)  This argument is meritless.  First, the adequacy of a search is not determined by the initial results, but rather, by the totality of defendant's efforts to locate and respond to a FOIA request.  *See Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) (granting summary judgment where initial search was unreasonable but ultimate search was reasonable and agency provided detailed declaration articulating search process); *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 2006 WL 1793297, at *3 (D.D.C. June 28, 2006) (describing as "meritless" plaintiff's argument that the agency "did not *initially* search all of the relevant offices and that its 'piecemeal' release of documents demonstrates that the agency search was

inadequate").  In fact, the D.C. Circuit has held that the performance of additional searches following an agency's initial response to a FOIA request not only does not discredit the original search, but to the contrary, actually indicates good faith and "suggest[s] a stronger…basis for accepting the integrity of the search."  *Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986).

Second, plaintiff's argument is particularly unconvincing given that he made no mention of his COM application until his administrative appeal in 2015, *after* defendant had already conducted its first round of searches in response to the FOIA request asking for documents contained in the Refugee Processing Center and WRAPS system file.  Although plaintiff is correct that an agency has a duty to construe FOIA requests liberally, *see Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995), it is also true that a requester has a duty to reasonably describe the records sought.  *See* 5 U.S.C. § 552(a)(3)(A)(i).  When plaintiff directed IPS's attention to his COM adjudication in his administrate appeal in 2015, it conducted a reasonable and appropriate subsequent search of the Kabul Embassy, which led to a supplemental production of responsive records.  *See Cooper v. U.S. Dep't of Justice*, 890 F. Supp. 2d 55, 63 (D.D.C. 2012) (granting summary judgment in favor of agency where an initial search did not target specific information, but the agency "show[ed] that it acted diligently in following clear and certain leads *after receiving additional information* from [the plaintiff]") (emphasis added).

Finally, plaintiff also maintains that defendant's multiple rounds of searches were inadequate because they failed to produce the "derogatory information" about plaintiff upon which his COM approval was denied.  (Pl's Mot. at 10.)  "[T]he adequacy of a FOIA search," however, "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *White v. U.S. Dep't of Justice Executive Office for*

*U.S. Attorneys*, 2012 WL 3059571, at *1 (D.C. Cir. 2012) (quoting *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 315 (D.C. Cir. 2003)).  Moreover, in making this argument, plaintiff ignores that not all responsive documents were disclosed.  To argue that the search was inadequate because he did not discover the information that he is seeking is therefore nonsensical.

### C.  Exemption 3

Defendant asserts that the majority of the responsive portions of all four Embassy documents are shielded from disclosure under FOIA Exemption 3.  The Court agrees.

Exemption 3 provides for nondisclosure of matters that are "specifically exempted from disclosure by statute…" 5 U.S.C. § 552(b)(3).  The exemption only applies if the statute in question "(A) requires that matters be withheld from the public in such a manner as to leave no discretion on the issues, and (b) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  *Id.*  Exemption 3 "differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990) (quoting *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987)).  Here, the Government contends that the four documents at issue are exempt from disclosure pursuant to the INA, which provides in relevant part:

> The records of the Department of State and of diplomatic and consular offices of the United States *pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential*…except that (1) in the discretion of the Secretary of State certified copies of such records may be made available to a court which certifies that the information contained in such records is needed by the court in the interest of the ends of justice in a case pending before the court.

INA § 222(f), 8 U.S.C. § 1202(f) (emphasis added).  The Court of Appeals has squarely held that INA § 222(f) is a statutory provision covered by Exemption 3 and accordingly, records subject to the provision are exempt from disclosure under FOIA.  *See Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 744 (D.C. Cir. 1983); *see also Beltraena v. Dep't of State*, 821 F. Supp. 2d 167, 177 (D.D.C. 2011); *Judicial Watch, Inc. v. Dep't of State*, 650 F. Supp. 2d 28, 33 (D.D.C. 2009); *Perry-Torres v. Dep't of State*, 404 F. Supp. 2d 140, 143 (D.D.C. 2005).

The remaining question therefore becomes whether the four documents recovered from the Embassy in Kabul are subject to the terms of Section 222(f).  It appears that no federal court has specifically addressed whether documents related to an applicant's COM adjudication qualify as records "pertaining to the issuance or refusal of visas or permits to enter the United States."  Plaintiff alleges that the documents are not covered by the statute because COM approval is a separate procedure from the subsequent application for a Special Immigrant Visa, rather than a first step that is intrinsically part of the SIV process itself.  (Pl's Mot. at 15.)

The plain language of the statute, which encompasses records "pertaining" to the issuance or refusal of visas, discourages such a strict interpretation of Section 222(f).  *See Medina-Hincapie*, 700 F.2d at 744 (the statute covers not only the information supplied by the visa applicant, but also any "information revealing the thought-processes of those who rule on the application"); *see also Soto v. Dep't of State*, 118 F. Supp. 3d 355, 368 (D.D.C. 2015) (documents related to a visa's revocation were exempt, even though revocation is a distinct process from "issuance" or "refusal" (citing *Beltraena*, 821 F. Supp. 2d)); *Judicial Watch*, 650 F. Supp. 2d at 33 (exempt records revealing how a Mexican drug smuggler was able to gain entry to the United States).

Plaintiff relies principally on *Darnbrough v. Dep't of State*, 924 F. Supp. 2d 213 (D.D.C. 2013), to argue that the statute should be interpreted narrowly.  In that case, the defendant sought to withhold a document containing the plaintiff's biographical data, details about his renunciation of U.S. citizenship, and his past application for a NEXUS card to visit the United States on the sole basis that it was retrieved from the State Department's CLASS database, which is used to determine visa eligibility.  The court was not persuaded, holding that a document did not "pertain to the issuance or refusal of visas" just because the State Department had chosen to store it in such a database.  *Id.* at 218 ("[T]he Court does not read that [Section 222(f)] language as stating a broad exemption for *any* document that happens to find its way into the Department's visa database.").  Thus, plaintiff's reliance on *Darnbrough* is misplaced.  In reaching its holding, the court found it to be dispositive that the State Department had conceded that the document was unrelated to any process to obtain a visa or permit, *id.* at 218-219, and it expressly distinguished its ruling from cases where, apart from details regarding a document's maintenance or categorization, the document was "gathered, used, [or] is being used" to "determine an actual past or pending visa application."  *Id.* at 218 (quoting *Immig. Justice Clinic v. Dep't of State*, 2012 WL 5177410, at *2 (S.D.N.Y. Oct. 18, 2012)).

Yet, that is precisely the situation here.  As a matter of both Congressional intent and administrative implementation, COM approval is clearly part of the Special Immigrant Visa application process.  The AAPA created COM approval to screen Afghans who choose to participate in the SIV program, and that is the sole reason for its existence as an administrative procedure.  *See* AAPA § 602(a)(2)(D) (requiring that the recommendation or evaluation from a supervisor be "accompanied by approval from the appropriate Chief of Mission…who shall conduct a risk assessment of the alien and an independent review of records maintained by the

United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of a petition under this section"). The AAPA does not impose an independent clock on timely COM processing; instead, the statute gives the State Department nine months to adjudicate SIV applications, a timeline which includes all steps "incidental to the issuance of [SIV] visas," "including…COM approval." *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States*, 2016 WL 927142, at *20 (D.D.C. Mar. 7, 2016) (citing AAPA §§ 602(4)(A). As a federal court recently explained, "SIV applications move through 14 steps, in the following four stages: Chief of Mission ('COM') Application Process; Form I-360 Adjudication; Visa Interview; and Visa Issuance." *Nine Iraqi Allies*, 2016 WL 927142, at *3; *see also* State Dep't SIV App. Website (listing COM application under the banner "Special Immigrant Visas for Afghans" as "STEP 1—Apply for Chief of Mission Approval"). Even the withheld documents related to plaintiff's COM adjudication have headings such as "SQ-SIV COM Committee Meeting Minutes" and "Mission Afghanistan SQ-SIV Program." In every meaningful sense, COM approval was conceived, and is administered, as one stepping stone along the path to Special Immigrant Visa issuance.

Plaintiff protests that COM approval cannot possibly pertain to the issuance of a visa, since he never advanced to the stage where he completed and filed a final SIV visa application; however, plaintiff's own words in his FOIA request belie the inseparable relationship between the two processes. *See* Hackett Declaration, Ex. 1 (plaintiff's FOIA request, asking for all documents and information "*pertaining to the SIV application of Hameedullah Airaj*") (emphasis added). Plaintiff purports to have always been interested in information about the adjudication

of his COM application, yet he asked for information pertaining to his "SIV application."  This is

understandable, given that COM approval is one part of the SIV application process.

In the context of the Special Immigrant Visa program created by Congress in the AAPA,

it strains credulity to view COM approval as anything but "pertain[ing]" to the issuance of a

Special Immigrant visa.  The Court therefore finds the four Embassy documents to be subject to

INA § 222(f), and thus exempt from disclosure under FOIA Exemption 3.[6]

### D. Exemptions 6 and 7(C)

Although defendant has properly withheld most of the Embassy documents under

Exemption 3, it asserts Exemptions 6 and 7(C) as the basis for redacting the name of a Bureau of

Diplomatic Security Special Agent that appears in three of the documents.  Exemption 6 permits

withholding information "the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy," 5 U.S.C. § 552(b)(6), while Exemption 7(C) shields from

disclosure "records of information compiled for law enforcement purposes" but only to the

extent that the production of such information "could reasonably be expected to constitute an

---

[6]      In support for his contention that Congress intended for the COM and SIV application
processes to be separate and distinct, plaintiff draws the Court's attention to a recent amendment
to the AAPA.  National Defense Authorization Act for 2014 § 1219, Pub. L. No. 113-66, 127
Stat. 913 (codified as note to 8 U.S.C. § 1101 (2013)).  The amendment requires that anyone who
is denied COM approval must be given "a written decision that provides, to the maximum extent
feasible, information describing the basis for the denial, including the facts and inferences
underlying the individual determination," and an opportunity to appeal the Government's denial
one time.  *Id.*
         However, the amendment did not become effective until December 2014 and was not
made retroactive, so defendant was not bound by its terms in replying to plaintiff's three COM
applications in 2011-2013.  (*See* Pl's Mot. at 15 (conceding that AAPA amendment became
effective in December 2014).)  With the amendment now in effect, it is arguable that an
additional COM application might require defendant to elaborate further on the basis for denying
COM approval.  (*See* Roberts Decl. ¶ 3 (suggesting that plaintiff filed a fourth COM application
on August 20, 2014, *after* the FOIA request at issue in this litigation).)  That issue, of course, is
not before this Court, so it will not opine on whether such a subsequent application would be any
more fruitful than plaintiff's past efforts.

unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Both exemptions require that the Court balance the privacy interests of the subjects of the requests with the public's interest in disclosure. *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).

Plaintiff has failed to demonstrate how the disclosure of the identity of the diplomatic security official would serve the public interest, whereas the diplomatic security agent has a significant privacy interest at stake. As defendant notes, the public identification of a diplomatic security agent "could result in unwanted attention and harassment" of the employee (Hackett Decl. ¶ 37), and "[e]ven seemingly innocuous information can be enough to trigger the protections of Exemption 6." *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005). "If there is no public interest in the disclosure of certain information, something, even a modest privacy interest, outweighs nothing every time." *Id.* The Court therefore agrees that defendant has properly withheld the name of the Bureau of Diplomatic Security Special Agent under Exemptions 6 and 7(C).[7]

### E. Segregation of Non-Exempt Portions of Withheld Material

The focus of FOIA is "information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Krikorian v. Dep't of State,* 984 F.2d 461, 467 (D.C. Cir.1993) (citation and internal quotation marks omitted). FOIA therefore imposes on federal agencies a duty to provide a requester all non-exempt information that is "reasonably segregable." 5 U.S.C. § 552(b). Non-exempt portions of documents must be disclosed unless they are "inextricably intertwined with exempt portions." *Mead Data Central, Inc. v. U.S. Dep't of Air Force,* 566 F.2d 242, 260 (D.C. Cir.

---

[7] Because defendant only invokes Exemption 5 to protect the disclosure of documents that have been properly withheld under Exemption 3, the Court need not address its application.

1977) (citations and internal quotation marks omitted).  To show that all "reasonably segregable" material has been released, defendant "must provide a detailed justification for its non-segregability."  *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

Defendant's *in camera* submission of the full, unredacted Embassy documents clearly demonstrates that it has only withheld the exempt portions of the documents, and thus defendant has adequately carried its burden to segregate all meaningful information not covered by the FOIA exemptions.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.  A separate Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: April 27, 2016